BART F. VIRDEN, Judge
In this termination-of-parental-rights case, both parents, appellants Nathan Arnold and Jessica Davis, separately appeal the Crawford County Circuit Court's order terminating their parental rights to NA (04/10/09) and ZA (03/02/12). The parents challenge both the statutory grounds for termination and the circuit court's best-interest determination. We affirm.
I. Relevant Facts
On May 22, 2017, the Arkansas Department of Human Services (the "Department") filed a petition for emergency custody and dependency-neglect contending that the removal of ZA and NA from their parents' custody was necessary to protect their health, safety, and welfare. Nathan was named as the putative father. In the affidavit attached to the petition, the Department asserted that on May 12, a family-service worker went to Nathan and Jessica's home and found severe environmental neglect. The family-service worker saw wet and dry trash throughout the house, piles of clothes, standing water in the bathroom sink, pet feces and urine, old food in the refrigerator and on the countertops, cigarette butts and ashes, and the home smelled strongly of pet feces. Both parents were drug tested and were positive for THC, barbiturates, opioids, benzodiazepine, and Oxycontin, and they could not provide prescriptions for any drugs. On May 15, the Department returned to reassess the situation. There was little improvement, and the family-service worker helped the parents *332 remove some of the clutter, including a mattress and a couch soaked in urine. On May 18, a family-service worker returned to the home and saw that the condition was unchanged. The parents tested positive for the same drugs as before. ZA and NA were removed from Nathan and Jessica's custody, and the Department placed a seventy-two-hour emergency hold on the children.
The circuit court entered an ex parte order for emergency custody on May 22, 2017. On May 30, the court entered a probable-cause and paternity order placing ZA and NA in the Department's custody. The circuit court found that emergency conditions necessitated the removal of the children from the parents' custody, and it was contrary to their welfare to be returned home. The court declared Nathan to be the legal father. An amended petition for emergency custody and dependency-neglect was entered on July 5 identifying Nathan as the biological father of the children.
On July 6, the circuit court entered an adjudication order in which it found that the allegations in the petition were true and that the parties had stipulated to dependency-neglect because of parental unfitness. The court found that Nathan, a noncustodial parent, contributed to the dependency-neglect of the children because he lived in the home and failed to address the environmental neglect. The parents were ordered to obey the orders of the court and comply with the case plan. Specifically, the circuit court ordered them to submit to drug-and-alcohol assessment and follow all recommendations, obtain appropriate housing, maintain contact with the Department and disclose all contact information, exercise visitation, and display proper parenting. The parents were ordered to pay child support.
On October 5, 2017, the circuit court entered a review order in which it found that safety concerns prevented both trial placement with the parents and return of the children to their custody. The circuit court found that Nathan and Jessica were unwilling or unable to meet the children's needs as evidenced by the continued environmental issues and drug use. The circuit court found the Department had made reasonable efforts to provide homemaking services, family-service-worker contact, transportation, assistance with Medicaid, psychological evaluations, counseling, parenting classes, and drug screening. The circuit court found that Jessica had minimally complied with the case plan. Jessica was unemployed, continued to use drugs, failed to complete either a drug assessment or a psychological evaluation, failed to attend counseling, intermittently visited with the children and displayed inappropriate parenting techniques during visits, and she had not maintained contact with the Department or cooperated with the Department until recently. Nathan, who at the time of the order was at an inpatient mental-health facility, was also found to have minimally complied with the case plan. The court found that Nathan was unemployed, continued to use drugs, failed to complete a drug assessment or a psychological evaluation, intermittently visited the children and displayed inappropriate parenting techniques, and had not maintained contact with the Department or cooperated with the Department; also, "due to an incident during transport to a visitation, the Department is no longer able to transport the father to visitation, but continues to offer transportation assistance in the form of gas cards." The court found that the home was still filthy and that the parents had not participated in services or made progress toward reunification. The court noted that both parents had scheduled drug-and-alcohol assessments and *333 psychological evaluations. The court found that "the parents need all their financial resources to achieve or maintain reunification" and that the Department was permitted to petition the court to require payment for the parents' failure to keep scheduled appointments.
On January 18, 2017, the circuit court entered a review order in which it found that the parents were still abusing drugs, they had minimally complied with the case plan, and the condition of the home was unchanged. The court found that the Department had complied with the case plan and orders of the court by providing homemaking services, family-service-worker contact, transportation, counseling, parenting classes, and drug screening. The court noted that Nathan was receiving inpatient care at a mental-health facility. The parents were ordered to comply with the case plan.
On April 19, 2018, following a hearing, the circuit court entered a permanency-planning order changing the goal of the case to adoption. The court determined that Jessica had not obtained appropriate housing, was unemployed, had not completed a psychological evaluation, had not obtained photo identification, had not attended drug treatment and continued to use illegal drugs, and had not cooperated with the Department. The court noted that she had begun attending visitation more regularly. The court found that Nathan had also failed to obtain employment or housing, failed to complete his psychological evaluation, possessed illegal substances, and had not cooperated with the Department. The court noted that Nathan had been discharged from the mental-health facility for leaving without notification. Nathan had begun visiting the children more regularly.
The Department filed a petition to terminate Nathan and Jessica's parental rights on May 22, 2018. As to both parents, the petition alleged that termination was supported by the following grounds: (1) willful failure to support, Arkansas Code Annotated section 9-27-341(b)(3)(B)(ii)(a ) ; (2) other factors, section 9-27-341(b)(3)(B)(vii)(a) ; (3) aggravated circumstances, section 9-27-341(b)(3)(B)(ix)(a)(3)(A)(B)(i) ; and (4) abandonment, section 9-27-341(b)(3)(B)(iv). Against Nathan, the Department also alleged the noncustodial parent's failure-to-remedy ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(b) . Against Jessica, the Department alleged the failure-to-remedy-ground regarding custodial parents, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(a) . The Department further alleged that termination of Nathan and Jessica's parental rights was in NA and ZA's best interest.
At the termination hearing on September 6, 2018, family-service worker Greg Steinsiek testified that the children came into the Department's custody on May 22, 2017, due to severe environmental neglect and parental drug use. Steinsiek testified that Jessica currently lived at Gateway treatment facility and Nathan lived at Harbor House, and the children could not live with either parent at these places. Photographs of the home, taken a month and half before the hearing, showed human feces standing inches deep in the bathtub, soiled toilet paper in the bathroom sink, bags of trash piled up in the living room, and animal feces covering the floor. Steinsiek explained that the parents had cut a hole in the bathroom window screen, and they collected the feces from the bathtub into a bucket, then passed the bucket out of the window to the outdoors where they would later bury the feces. The parents did not have running water in the home, and the conditions had not been corrected when Jessica and Nathan entered *334 the treatment facilities. Neither parent had been granted unsupervised visitation during the pendency of the case. He explained that although the parents had recently begun to consistently exercise visitation, there were periods where the parents did not visit the children regularly. The parents had not provided birthday or Christmas gifts for the children, and they had not provided any material support. Steinsiek testified that when he was assigned to the case in June, both parents were in inpatient treatment, and he had not made any referrals. He explained that before his assignment to their case, the parents had been offered the court-ordered Department services including counseling, parenting classes, haul-off services, drug screening, assistance getting into local shelters, and psychological evaluations. Steinsiek stated that Jessica entered inpatient treatment on May 30, and she completed a second round of treatment that had begun on July 19. Jessica entered transitional treatment on August 16. Jessica had completed parenting classes, she was in psychological counseling, she completed drug-and-alcohol assessment and was in treatment, and she had submitted to random drug screening. Steinsiek testified that his main concern for Jessica is that she had not had enough time to appropriately address the issues that had caused removal, and she did not have the ability to take care of the children "on a daily basis." He testified that visitations had gone well, but afterward the children were very emotional and stressed out, though this was getting better with time.
Steinsiek stated that the children are adoptable. Steinsiek testified that the children were in second and fourth grade, had no major health issues, and are relatively young. He explained that because neither Nathan nor Jessica had demonstrated the ability to provide a safe environment and because of the drug-related issues that remained, there was risk of harm in returning NA and ZA to their parents. Steinsiek stated that he was concerned about "the overall fitness of each parent to maintain their relationship and meet the needs of the children."
Dario Mellado testified about the incident with Nathan during transportation from visitation in Little Rock back to Van Buren. During the ride home, Nathan became very emotional and made a statement about "hurting someone in the throat," which alarmed Mellado. That day, Nathan had been in a great deal of pain due to a physical ailment, and he was having bowel or bladder issues. Mellado testified that he pulled the car over to give Nathan a chance to cool off, and Jessica comforted him and provided good support. Mellado stated that until Nathan got some psychological counseling, he did not feel comfortable transporting him again. He stated that visits had gone well and that he had seen "a very positive relationship" between Nathan and the kids.
Jessica testified that she entered Gateway on May 30, 2018, and she would be there another two and a half months. She testified that she did not have housing or a job but that Gateway would help her find employment, and she had applied to several places online. Gateway offered a "phase three" housing arrangement where parents could have their children with them, and she was trying to phase into that. Jessica explained that the children were removed from her custody because of her drug use and because of the environmental conditions of the home. Jessica testified that the last time she used drugs was May 29 and that she had lived in the filthy home until inpatient treatment began. Jessica stated that she used bus passes and got rides from friends but that she was working on getting her license. Jessica explained that she had grown up with an *335 abusive, alcoholic father and with her mother, who had been, and still was, a hoarder. Jessica stated that she began having back problems after a car accident when she was thirteen. Jessica testified that she had experienced a great deal of anxiety growing up, and she had been recently diagnosed with depression.
The circuit court entered the order terminating Nathan and Jessica's parental rights on October 19, 2018. The circuit court found by clear and convincing evidence that each statutory ground alleged by the Department supported termination, and it determined that it was in the children's best interest to terminate parental rights specifically considering the adoptability of the children and the potential harm in returning them to their parents' custody. Both parents timely filed notices of appeal.
II. Standard of Review
We review termination-of-parental-rights cases de novo. Mitchell v. Ark. Dep't of Human Servs. , 2013 Ark. App. 715, 430 S.W.3d 851. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2017); Dunn v. Ark. Dep't of Human Servs. , 2016 Ark. App. 34, 480 S.W.3d 186. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Vail v. Ark. Dep't of Human Servs. , 2016 Ark. App. 150, at 10, 486 S.W.3d 229, 234. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Yarborough v. Ark. Dep't of Human Servs. , 96 Ark. App. 247, 240 S.W.3d 626 (2006). Credibility determinations are left to the fact-finder, here the circuit court. Schaible v. Ark. Dep't of Human Servs. , 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 371.
III. Discussion
A. Statutory Grounds Supporting Termination
Jessica contends that beginning May 30, 2018, she began to participate in services offered by the Department and that the circuit court erroneously ignored her efforts to comply with the case plan. Jessica argues that the instant case is similar to Prows v. Arkansas Department of Human Services , 102 Ark. App. 205, 283 S.W.3d 637 (2008), in which our court held that the circuit court erred as a matter of law by ruling that it was barred from considering Prows's recent mental stability and that section 9-27-341(b)(3)(B)(vii) "contains no such evidentiary bar." Id. In the instant case, the circuit court did not misinterpret the statute as the circuit court did in Prows , and Prows is inapplicable here.
Moreover, Arkansas Code Annotated section 9-27-341(a)(4)(A) expressly provides that a parent's overtures toward complying with the case plan and circuit court orders that occur only after the permanency-planning hearing are insufficient to defeat the termination of parental rights. In the present case, Jessica testified that she used drugs the day before she began treatment, weeks after the permanency-planning hearing. Jessica admitted that she had made little effort to comply with the case plan before the permanency-planning hearing. Although both parents made efforts to rehabilitate themselves after the permanency-planning hearing, their eleventh-hour improvements *336 need not be credited by the circuit court and will not be held to outweigh evidence of prior noncompliance. See Henderson v. Ark. Dep't of Human Servs., 2010 Ark. App. 191, 377 S.W.3d 362 ; Krass v. Ark. Dep't of Human Servs. , 2009 Ark. App. 245, 306 S.W.3d 14.
The circuit court found that the statutory grounds supporting termination as to both Nathan and Jessica are supported by clear and convincing evidence. Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a) sets forth the other-subsequent-factors ground for termination-that other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the children in the custody of the parent is contrary to their health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the children in the custody of the parent. Failure to comply with court orders is a subsequent factor on which termination may be based. Rivera v. Ark. Dep't of Human Servs. , 2018 Ark. App. 405, at 15, 558 S.W.3d 876, 884. A lack of urgency supports a finding of failure to remedy subsequent factors despite appropriate family services being offered. Ewasiuk v. Ark. Dep't of Human Servs. , 2018 Ark. App. 59, at 18, 540 S.W.3d 318, 327.
Beginning May 22, 2017, the parents were ordered to accomplish certain goals to provide a suitable home for NA and ZA, and both parents failed to remedy the subsequent factors despite appropriate services having been offered. By the time Jessica and Nathan began any semblance of serious effort in this case, NA and ZA had been in custody for twelve months. During those months, neither parent had made significant efforts to comply with the case plan except to inconsistently exercise visitation and to attend staffings and hearings. Jessica contends that it was error for the circuit court to consider the filthy conditions of the home because neither she nor Nathan had lived there since they entered inpatient treatment facilities. We disagree. The court's consideration of the conditions of the home supports its determination that Jessica and Nathan never dealt with the environmental conditions despite a year of Department services. A parent's past behavior is often a good indicator of future behavior. Stephens v. Ark. Dep't of Human Servs. , 2013 Ark. App. 249, at 8, 427 S.W.3d 160, 164.
Because only one statutory ground must be proved to support termination of parental rights, we do not address the other statutory grounds found by the circuit court. Ark. Code Ann. § 9-27-341(b)(3)(B).
B. Best-Interest Determination
In making a "best-interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential harm to the child if custody is returned to a parent. Miller v. Ark. Dep't of Humans Servs. , 2016 Ark. App. 239, 492 S.W.3d 113. The potential-harm analysis is to be conducted in broad terms. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. Credibility determinations are for the circuit court to make, not this court. Bridges v. Ark. Dep't of Human Servs. , 2019 Ark. App. 50, at 8, 571 S.W.3d 506.
When making the decision whether to terminate parental rights, the circuit court has a duty to look at the case as a whole and how the parent has discharged his or her parental duties, the *337 substantial risk of serious harm the parent imposes, and whether the parent is unfit. Black v. Ark. Dep't of Human Servs. , 2018 Ark. App. 518, at 8, 565 S.W.3d 518, 523. Partial or even full completion of the case plan is not determinative of the outcome of the termination proceeding. Wright v. Ark. Dep't of Human Servs. , 83 Ark. App. 1, 115 S.W.3d 332 (2003). What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for the child; mere compliance with the orders of the court and the Department is not sufficient if the roots of the parent's deficiencies are not remedied. Lee v. Ark. Dep't of Human Servs. , 102 Ark. App. 337, 345-46, 285 S.W.3d 277, 282-83 (2008). The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 20137).
Jessica challenges the adoptability prong of the best-interest finding of the court. She contends that although family-service worker Steinsiek knew the grades NA and ZA were in, he did not know the exact age of the children, showing a lack of familiarity with the proceedings. Jessica also contends that there was no testimony from an adoption specialist that the children had been matched with any families and that the children had displayed troubling behavior at times. Jessica's argument regarding the court's determination that the children are adoptable is unpersuasive. There is no requirement that there must be testimony regarding potential matches for a sibling group. While the likelihood of adoption must be considered by the circuit court, that factor is not required to be established by clear and convincing evidence. Hamman v. Ark. Dep't of Human Servs. , 2014 Ark. App. 295, 435 S.W.3d 495. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. Id.
Jessica's assertion that the children's "troubling" behavior is an indication that the court's adoptability determination was erroneous is a request for this court to reweigh the evidence, which we do not do. Newman v. Ark. Dep't of Human Servs. , 2016 Ark. App. 207, 489 S.W.3d 186. Moreover, the circuit court's finding is supported by the caseworker's testimony. Steinsiek testified that although the children came into foster care with severe emotional issues, they had made great strides in therapeutic foster care. NA and ZA had not known how to clean themselves when they entered the Department's custody; however, since their removal they had learned how to take care of their personal hygiene. Steinsiek noted that they "blew" their first foster care placement but were doing much better in a therapeutic foster home and were placed together. NA had been aggressive and controlling toward ZA when they first entered the Department's custody, but by the time of the termination hearing, the sibling issues had been reduced to once or twice a week and were more easily resolved.
Both Nathan and Jessica assert that they and the children are bonded to each other and their familial bond requires reversal. In support of their argument, they cite to Strickland v. Arkansas Department of Human Services , 103 Ark. App. 193, 287 S.W.3d 633 (2008), in which this court held that when there are positive, nurturing relationships, the law favors preservation of familial bonds. Strickland is distinguishable from the instant *338 case because unlike the parents here, Strickland maintained appropriate housing, and she had reliable transportation and income. Strickland had also been granted unsupervised visitation during the case. Here, neither parent had ever maintained a home where the children could live, and they had never demonstrated the ability to safely parent the children. Appellate review here is limited to whether the circuit court's best-interest finding was clearly erroneous. Vail v. Ark. Dep't of Human Servs. , 2016 Ark. App. 150, at 13, 486 S.W.3d 229, 236. Both Nathan's and Jessica's drug rehabilitation was still a work in progress at the time of the hearing, and the conditions of the home continued to remain an issue despite the Department's homemaker services.[1]
The same facts that support the subsequent-factor ground support the potential-harm determination. Neither parent ever cleaned the home. Both Nathan and Jessica delayed participation in the case plan such that they were unable to demonstrate sobriety or parenting skills while living outside a treatment facility with two children in their care. Moreover, neither parent would complete the treatment programs in a time that was meaningful to the children. The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm in determining whether termination of parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii).[2]
Affirmed.
Murphy and Brown, JJ., agree.

Though Nathan contends that homemaker services were not offered after the removal of the children from the home, the circuit court made repeated findings that the Department had made reasonable efforts to provide family services to Nathan and Jessica. None of these findings were appealed, and Nathan is barred from challenging those prior findings. See Martin v. Ark. Dep't of Human Servs. , 2017 Ark. 115, 515 S.W.3d 599.

Nathan asserts for the first time that Jessica should maintain her parental rights because of her recent progress in complying with the case plan. Nathan does not have standing to present argument regarding Jessica's parental rights, and we do not address his assertion on appeal. See Cole v. Arkansas Dep't of Human Servs., 2018 Ark. App. 121, 543 S.W.3d 540 ; King v. Ark. Dep't of Human Servs. , 2018 Ark. App. 464, 562 S.W.3d 226 (Even in termination of parental rights cases, this court will not address arguments raised for the first time on appeal.)